**STATE OF NORTH CAROLINA**
**COUNTY OF BUNCOMBE**

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 22-CVS-

22 CV 01232

22 APR -4

BUNCOMBE COUNTY, C.S.C

BY

**GLF CONSTRUCTION CORPORATION,**

        Plaintiff,

v.

**HEARTLAND CONCRETE, L.L.C.,**

        Defendant.

**COMPLAINT**

**NOW COMES** Plaintiff GLF Construction Corporation ("GLF"), by and through undersigned counsel, complaining of Defendant Heartland Concrete, L.L.C. ("Heartland") and alleging as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      GLF is a corporation organized and existing under the laws of the State of Florida with a principal place of business in Miami, Florida and registered and authorized to conduct business in the State of North Carolina.

2.      Upon information and belief, Defendant Heartland is a limited liability company organized and existing under the laws of the State of Virginia.

3.      This Court has jurisdiction over the subject matter of this lawsuit pursuant to N.C. Gen. Stat. § 7A-240 and § 7A-243 because it is a justiciable matter of a civil nature in which the amount in controversy exceeds the sum of Twenty-Five Thousand Dollars ($25,000), exclusive of interest, costs, and attorneys' fees.

4.      This Court has personal jurisdiction over Heartland pursuant to N.C. Gen. Stat. § 1-75.4. Further, the exercise of personal jurisdiction over Heartland comports with due process because Heartland has sufficient minimum contacts with the State of North Carolina such that the exercise of jurisdiction does not offend traditional notices of fair play and substantial justice.

EXHIBIT
1

5.     Venue is proper in Buncombe County because a substantial part of the events or omissions giving rise to this action occurred in this County, and the parties designated Buncombe County in the contract giving rise to this action.

## FACTUAL ALLEGATIONS

6.     This lawsuit arises out of a construction project for the repair and rehabilitation of a portion of Interstate-40, including the rehabilitation of six (6) bridges in Buncombe County, North Carolina (the "Project").

7.     The North Carolina Department of Transportation, the Owner, entered into a contract with Harrison Construction-APAC Atlantic, Inc. ("Harrison") for general contracting services for the Project.

8.     Harrison, in turn, contracted with GLF to perform roadway concrete repair and rehabilitation work on the bridges as more specifically outlined in Schedule I to the Harrison-GLF contract.

9.     On or about March 27, 2018, GLF and Heartland signed a purchase order for certain materials from Heartland for use on the Project (the "PO") including, but not limited to, Latex Modified Concrete – Very Early Strength ("LMC-VES" or the "Products"). A true and accurate copy of the PO is attached hereto as **Exhibit A** and incorporated herein by reference.

10.     Pursuant to Article 6 of the PO, Heartland warranted "that the Products [were] suited and appropriate for the particular purpose or use intended on the [P]roject." Article 6 also states that the aforementioned warranty is "in addition to all warranties under applicable law."

11.     According to Article 8 of the PO, "[t]he approval of [submittals for approval] by [the NCDOT] or [GLF] [did] not relieve [Heartland] of its obligation to provide Products that [met] all requirements of [NCDOT]."

12. Article 11 states that GLF also had the ability to "reject the Products at any time that [NCDOT] determin[ed] that the [P]roducts [were] nonconforming to [NCDOT's] specification requirements, regardless of whether [GLF] had previous opportunity to inspect the Products and regardless of whether the Products [had] been incorporated into the [P]roject." Likewise, payment did not constitute acceptance of the Products under the PO.

13. Finally, Heartland agreed to "indemnify and hold harmless [GLF] against all damages, losses, claims, liabilities, and expenses (including attorneys' fees) arising or resulting from (a) any defect in the Products and/or (b) from any act or omission of [Heartland] or its agents, . . . vendors, manufacturers, or lower-tier subcontractors."

14. On or around April 30, 2018, GLF began its work on the Project.

15. GLF, with the assistance of Heartland, installed the materials that it purchased from Heartland under the PO, including the Products, on the bridges on the Project.

16. GLF completed its scope of work on the Project, including the bridge repair work, on or around August 9, 2018.

17. In the fall of 2019, NCDOT notified Harrison and GLF that there was an issue with the Products resulting in holes in the surfaces of the bridge decks on the Project. This was the first notice GLF received that there may be defects with Heartland's Products.

18. In its notice, NCDOT also explained that it was experiencing the same issue on another Project it had ongoing in close proximity to the Project. Specifically, NHM Constructors, LLC entered into a contract for bridge work for NCDOT (the "NHM Project"). Heartland also provided the Products for the NHM Project, and the NHM Project was experiencing similar issues with Heartland's Products as GLF.

19.     NCDOT requested a meeting with GLF and Harrison to discuss the issues with the latex concrete Products on the bridges and the initial repairs needed on two of the bridges. GLF forwarded the NCDOT's meeting request to Heartland.

20.     GLF and Harrison met with NCDOT on December 17, 2019 and discussed the 435 defects identified in the bridge decks on the Project.

21.     Over the course of the next six months, NCDOT, GLF, and Heartland discussed the repairs that would be necessary to make the bridges operational as well as the cost of said repairs. The initial repair plan contemplated the repair of two bridges with the understanding that the remaining four bridges on the Project would likely also need to be repaired to remove and replace the defective concrete.

22.     On June 6, 2020, GLF's project manager for this Project emailed Heartland the basic procedure required for the "corrective action" on the LMC-VES.

23.     GLF's project manager also sent Heartland the budget for the NCDOT required repair work on two of the bridges.

24.     In July 2020, Heartland's insurance carrier sent an engineer onsite to "investigate" and provide a "report" as to the status of the Project and the source of the defects in the LMC-VES on the Project and NHM Project.

25.     On September 24, 2020, NCDOT issued its official latent defects notice to Harrison informing it of the "grout pockets" on "all the bridges" that were overlaid with Heartland's LMC-VES. Citing to the standard specifications that governed construction on the Project, NCDOT notified Harrison that it would be liable for the defects on all six bridges.

26.     Harrison, in turn, looked to GLF for the repair of the bridge defects.

27.     Two weeks later, Heartland's insurer's engineer issued its report (the "Report"). The Report addressed the defects that arose on both the Project and the NHM Project.

28.     In delivering the Report to GLF, Heartland's General Manager, Tom Buono, told GLF that its insurer's engineer "did not inspect any bridges on" the Project in creating the Report, but the engineer suspected the surface defects on the Project's bridges were similar to those on the NHM Project's bridges.

29.     Nonetheless, the Report led Heartland to issue a single message to both GLF and NHM on both Projects: the defects in the various bridge decks were the result of errors by NHM and GLF, respectively.

30.     On November 9, 2020, Heartland, GLF, Harrison, and NCDOT met to discuss the defects and timeline for repairing and replacing the concrete on the first two bridges.

31.     On November 11, 2020, GLF sent Heartland a letter putting it on notice that the cost of the repairs required by NCDOT were Heartland's responsibility since the repairs stemmed from Heartland's defective Products.

32.     Heartland responded on December 11, 2020 disclaiming all liability and responsibility.

33.     Specifically, despite Heartland's Products being the "common denominator" on both the NHM Project and the Project, and Buono specifically telling GLF that Heartland's insurer's Report was not based on an inspection of the bridges on the Project, Heartland denied all liability based on the Report's findings.

34.     On February 8, 2021, GLF sent Heartland a second letter demanding that it cover the costs associated with the repair work on the Project's bridges.

35.     Again, Heartland refused to honor its contractual obligations including its warranty obligations under the PO.

36.     In in the interim, NCDOT confirmed that all six bridges would need repairs to their latex modified concrete overlays.

37.     On June 1, 2021, counsel for GLF sent Heartland a letter attaching correspondence from the NCDOT wherein NCDOT established a protocol for repairs to all six bridges. A true and accurate copy of this letter is attached hereto as **Exhibit B** and incorporated herein by reference.

38.     In the letter, GLF offered Heartland the opportunity to perform the repair work in accordance with the NCDOT's protocol.

39.     GLF also notified Heartland that if it chose not to perform the repairs, GLF would perform the repairs and back charge Heartland for the cost of the repair work.

40.     Heartland rejected GLF offer to perform the repair work on the Project's bridges.

41.     GLF performed the repairs on the bridges using other materials suppliers and subcontractors, and it completed its repair work in the winter of 2021.

42.     GLF incurred costs and damages as a result of Heartland's defective Products. GLF's cost to perform the repair work totaled $116,901.02. This amount includes costs for labor, materials, equipment, inspections, forensic analysis, and other indirect costs.

43.     Due to Heartland's repeated failure to fix the defects in its Products over the past two years, GLF has also incurred other costs, fees, and attorneys' fees.

## FIRST CAUSE OF ACTION
*Breach of Contract*

44.     GLF incorporates by reference the allegations contained in Paragraphs 1 through 43 as if fully set forth herein.

6

45.     Pursuant to the PO, Heartland had an "obligation to provide Products that [met] all requirements of [NCDOT]."

46.     Heartland provided Products to GLF for the Project which were incorporated into the bridge decks on the Project.

47.     The Products did not meet all the requirements of the NCDOT and were, in fact, defective.

48.     The Products resulted in hundreds of defects on the bridge decks including, but limited to, holes and grout pockets.

49.     Under the PO, GLF had the ability to "reject the[se] Products at any time that [NCDOT] determin[ed] that the products [were] nonconforming to [NCDOT's] specification requirements, regardless of whether [GLF] had previous opportunity to inspect the Products and regardless of whether the Products have been incorporated into the [P]roject."

50.     NCDOT informed GLF that Heartland's Products provided were defective.

51.     GLF immediately rejected the products, notified Heartland of the defects, and asked that Heartland replace the defective Products with goods that conformed with the NCDOT's project specifications and cover the cost for these repairs.

52.     Heartland refused to do so notwithstanding the plain language of the PO.

53.     Heartland breached its PO with GLF by providing faulty Products for the Project.

54.     Heartland breached its PO with GLF by refusing to cover the cost of repairs on the Project.

55.     Heartland breached its PO with GLF by refusing to honor its defense and indemnity obligations and cover the damages stemming from its defective Products.

56.     As a direct and proximate result of these breach(es), GLF has incurred and will continue to incur costs in repairing and replacing the bridges on the Project.

57.     As a direct and proximate result of Heartland's refusal to cover the costs of the repair work and defective Products, GLF has been damaged in an amount of no less than $116,901.02, but in an exact amount to be proven at trial.

58.     Based on the foregoing, GLF seeks and is entitled to recover damages from Heartland for any and all damages that GLF has incurred as a result of the breach(es) of the PO by Heartland together with attorneys' fees and costs.

## SECOND CAUSE OF ACTION
*Breach of Implied Warranty of Merchantability*

59.     GLF incorporates by reference the allegations contained in Paragraphs 1 through 58 as if fully set forth herein.

60.     Heartland impliedly warranted that the Products it provided for the Project pursuant to the PO would be in accordance with the relevant plans, specifications, and drawings provided for the Project as well as industry standards, customs, and practices.

61.     Heartland impliedly warranted that, *inter alia*, the Products it provided would comply with relevant NCDOT specifications, the Products would be substantially similar to those represented in the contract documents, and the Products would be fit for use on bridge decks as intended per the contract documents.

62.     GLF relied on Heartland's warranties and believed that the Products supplied by Heartland were of good quality and were provided as represented in the PO.

63.     Heartland confirmed that the Products were supplied as required when it requested payment and invoiced GLF for the Products. However, the Products supplied by

Heartland to GLF (and other contractors in this same timeframe) did not perform as warranted and were defective at the time of sale.

64.     The failure to provide Products as warranted, along with Heartland's refusal and failure to cover the cost to repair the bridges, constitutes a breach of the implied warranty set forth herein.

65.     As a direct and proximate result of Heartland's breach of the implied warranty, GLF has incurred damages in an amount of no less than $116,901.02, but in an exact amount to be proven at trial.

66.     Based on the foregoing, GLF seeks and is entitled to recover damages from Heartland for any and all damages that GLF has incurred as a result of the breach(es) by Heartland together with attorneys' fees and costs.

## THIRD CAUSE OF ACTION
*Breach of Express Warranty*

67.     GLF incorporates by reference the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

68.     Pursuant to Article 6 of the PO, Heartland expressly warranted that the Products were fit for the particular purpose they were purchased for (i.e. use on the bridges of the Project) and would work in accordance with the plans, specifications, applicable drawings, and other contract documents on the Project.

69.     GLF relied on Heartland's warranties and believed that the Products were without defect and/or deficiency.

70.     However, Heartland's Products were defective and the actual condition of the Products was materially different from that represented in the PO, specifications, and other contract documents.

71. The defective and deficient Products supplied by Heartland constitute a breach of the express warranties as set forth hereinabove.

72. As a direct and proximate result of Heartland's breach of the express warranties, GLF has incurred damages in an amount of no less than $116,901.02, but in an exact amount to be proven at trial.

73. Based on the foregoing, GLF seeks and is entitled to recover damages from Heartland for any and all damages that GLF has incurred as a result of Heartland's breach of the express warranty in the PO together with attorneys' fees and costs.

## DEMAND FOR JUDGMENT

**WHEREFORE**, Plaintiff GLF prays the Court to enter judgment in its favor and against Heartland as follows:

a. That Heartland be held liable under each claim for relief set forth in this Complaint;

b. That GLF has and recovers monetary damages against Heartland for all damages suffered as a result of the acts complained herein;

c. That GLF has and recovers pre-judgment and post-judgment interest as may be allowed by law;

d. That the costs of this action, including reasonable attorneys' fees, be taxed against Heartland pursuant to applicable law;

e. That a jury trial be had on all issues of fact; and

f. That the court award GLF such other and further relief as may be deemed just and proper.

Respectfully submitted this the 30th day of March 2022.

BRADLEY ARANT BOULT CUMMINGS LLP

Ryan L. Beaver, N.C. Bar No. 35156
Anna-Bryce Hobson, N.C. Bar No. 54260
Maria Carisetti, N.C. Bar No. 57843
214 North Tryon Street, Suite 3700
Charlotte, NC 28202
Telephone: (704) 338-6000
Facsimile: (704) 332-332-8858
Email: rbeaver@bradley.com
        ahobson@bradley.com
        mcarisetti@bradley.com

*Attorneys for GLF Construction Corporation*

# EXHIBIT A


Scanned to
MAR -- 18
LaserFiche







**GLF CONSTRUCTION CORPORATION**
1428 Brickell Avenue, Suite 700
Miami, FL 33131
Tel: (305) 371-5228 Fax: (305) 371-9201

**PURCHASE ORDER NO.: 437-0001**

| | |
|---|---|
| Date: | 3/21/2018 |
| Contract: | C204054 |
| Job No.: | 437 |

This Agreement is by and between GLF Construction Corporation, ("Buyer") and Heartland Concrete ("Seller").

| Seller's Address/Phone No.: | Bill to Address: |
|---|---|
| Seller Name: Heartland Concrete | GLF Construction Corporation |
| Attention: Tom Buono | Attention: Sarah Roper |
| Address: 23220 Airpark Dr., Petersburg, VA 23803 | Address: 31 College Pl. Bldg. D Suite 304, Asheville, NC 28801 |
| Phone: 804-518-0361 | Phone: 828-552-3233 |
| Fax: 804-518-0363 | Fax: 828-552-3235 |
| Email: Tom.Buono@heartlandconcrete.us | Email: sroper@glfusa.com |

**1.**      **GOODS TO BE PURCHASED**

Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer the following (hereafter collectively referred to as the "Goods"):

| COST CODE | CATEGORY | DESCRIPTION | QTY. | UNIT PRICE | | TOTAL PRICE | |
|---|---|---|---|---|---|---|---|
| 05-010010 | S | Mobilization - Project | 1.00 | $ | 12,100.00 | $ | 12,100.00 |
| 05-010010 | S | Mobilization - Weekly | 8.00 | $ | 1,480.00 | $ | 11,840.00 |
| 60-050140 | M | Latex Modified Concrete - Very Early ( | 237.50 | $ | 887.00 | $ | 210,662.50 |
| | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| - | | | - | $ | - | $ | - |
| | | **SUBTOTAL** | | | | $ | 234,602.50 |
| | | **SALES TAX ( 7%)** | | | | $ | 14,746.38 |
| | | SALES TAX ON MATERIAL ONLY | | | | | |
| | | **TOTAL** | | | | $ | 249,348.88 |
| Requisitioned by: | | Seller's Reference: | | Order Date: | | | |

**2.**      **PURCHASE PRICE**

In full consideration for the Goods, Buyer shall pay Seller    $ 249,348.88   (including all applicable sales taxes).

The Purchase Price is firm and is not subject to change and includes any and all costs of packing and transporting the goods at the place of delivery set forth in paragraph 3 below.

**3.**      **DELIVERY**

Subject to the provisions of paragraph 4 below, Seller shall deliver the Goods:

☐   at _____ on or before _____, 201__

☐   In accordance with the delivery/payment schedule attached hereto and made a part hereof.

This order is subject to the additional terms and conditions of sale reflected on the reverse side hereof, without condition or exception. Any conflicting or contrary terms contained in any offer, any other agreement or any other document are expressly rejected and not made a part hereof.

By: _____
     **GLF CONSTRUCTION CORPORATION**

Date: 3/27/18

Order Accepted by: _____
          Signature

Date: 3/27/18

000FR029_04

4. This purchase order ("PO") is strictly limited to the language on the face hereof, these Terms and Conditions ("T&C"), and Owner's specifications (as may be applicable to the all products, goods, and services to be furnished hereunder (collectively the "Products"), which are a complete and exclusive statement of the terms of this PO, which together constitute the entire and final agreement between the parties, and which can be modified only by written change order signed by Buyer. Additional or modified terms or conditions proposed or imposed by Seller identified on the face of this PO are prohibited regardless of industry custom or standards, prior course of dealings between Buyer and Seller, and/or Buyer's historical conduct inconsistent with these T&C.

5. This PO will result in a binding contract between Buyer and Seller under one or more of the following circumstances: (a) Seller provides Buyer with written, executed acceptance hereof or (b) Seller performs or undertakes to perform this PO, which will include, without limitation, partial or installment shipments or deliveries. Seller's acceptance is limited to the terms of this PO, as set forth in Paragraph 4, above. Upon acceptance, Seller will perform in accordance with this PO in its entirety. Under no circumstances will this PO be construed as one or more open accounts or as a series of individual transactions or contracts.

6. Seller will extend all warranties from its manufacturers, suppliers, and vendors to Buyer. Seller warrants that all Products will be merchantable, of good quality, and free from any defects in workmanship or material. Seller also warrants that the Products are suited and appropriate for the particular purpose or uses intended on the project. These warranties are in addition to all warranties under applicable law.

7. Time is of the essence as to all terms of this PO. Seller will take all reasonable actions, at Seller's expense, including, without limitation, overtime and expedited shipping, to meet all delivery schedules, dates, and deadlines set forth or referenced on the face of this PO. Buyer will be entitled to delay the production, shipment, delivery, or acceptance of the Products indefinitely. In such event, Seller will hold the goods in accordance with Buyer's instructions and Buyer will be liable only for actual, direct costs incurred by Seller for storage of the Products by reason of Buyer's instruction.

8. Seller will submit any submittals for approval as required by Owner's specifications. The approval of such submittals by Owner or Buyer will not relieve Seller of its obligation to provide Products that meet all requirements of Owner.

9. The prices reflected on the face of this PO will remain firm until final acceptance by the project owner of Buyer's work, and Seller will have no right to any price adjustment or additional compensation, regardless of (a) delays in the production, shipment, delivery or acceptance of the Products; (b) market fluctuations; or (c) increased production, including, without limitation, costs of raw materials, fuel, labor, production, or transport.

10. Owner, Buyer, and their representatives will be allowed access to Seller's facilities and properties and to the facilities and properties of Seller's vendors or suppliers for purposes of inspecting the Products and expediting production, delivery, and/or shipment of the Products. Seller will timely furnish schedules and progress reports upon request from Buyer.

11. Payment for Products provided under this PO will not constitute acceptance thereof. Products will be accepted only after having been actually counted, inspected, and tested by Buyer or its representatives and found to be in conformance with this PO. Failure or delay with respect to counting, inspection, or testing by Buyer will not relieve Seller of any responsibility hereunder. Additionally, Buyer may reject the Products at any time that Owner determines that the Products are nonconforming to Owner's specification requirements, regardless of whether Buyer had previous opportunity to inspect the Products and regardless of whether the Products have been incorporated into the project.

12. Seller may submit an invoice for payment upon delivery of Products by Seller and inspection and acceptance by Buyer. Such invoice will be incorporated into Buyer's next application for payment to Owner, and payment will be made to Seller within 30 calendar days after invoice date by Buyer. GLF Construction Corporation agrees to pay interest at the rate of 18% per annum on all past due invoices and attorney's fees of 25% of the balance due in the event of collection. GLF Construction Corporation is obligated to pay Heartland's invoices and is not contingent upon receipt of payment from any third party.

13. Seller will indemnify and hold harmless Buyer against all damages, losses, claims, liabilities, and expenses (including attorneys' fees) arising or resulting from (a) any defect in the Products and/or (b) from any act or omission of Seller or its agents, employees, suppliers, vendors, manufacturers, contractors, subcontractors, or lower-tier subcontractors. Seller also agrees to indemnify and hold Buyer harmless from any patent, trademark, or copyright violation associated with the Products.

14. Seller is an independent contractor and agrees that all persons performing work associated with this PO will not be considered employees of Buyer.

15. This PO will be governed by and construed in accordance with the laws of the State of North Carolina, without respect to conflicts of laws principles. All disputes and claims arising from or relating to this PO will be resolved only in a court of competent jurisdiction in and for Buncombe County, North Carolina, and such court will constitute the sole and exclusive venue and jurisdiction. BUYER AND SELLER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION ARISING OUT OF OR RELATED TO THIS PO.

16. In the event of any dispute arising under this PO, whether or not a lawsuit or other proceeding is filed, the prevailing party will be entitled to recover its reasonable attorneys' fees and costs (including those incurred in any related appeals), including attorneys' fees and costs incurred in litigating entitlement to attorneys' fees and costs, as well as in determining or quantifying the amount of the recoverable attorneys' fees and costs. The reasonable costs to which the prevailing party is entitled will include costs that are taxable under any applicable statute, rule, or guideline, as well as non-taxable costs, including, but not limited to, costs of investigation, copying costs, legal research costs, electronic discovery costs, telephone charges, mailing and delivery charges, information technology support charges, consultant and expert witness fees, travel expenses, court reporter fees, and mediator fees, regardless of whether such costs are otherwise taxable.

17. All Products provided pursuant to this PO will comply with, satisfy, and be subject to all applicable statutes, codes, ordinances, rules, regulations, and contract requirements of any governmental authority having jurisdiction. Plans and, specifically, without limitation, Material Safety Data Sheets ("MSDS") must accompany shipments of any items containing toxic substances listed in ch. 442, Florida Statutes.

18. No part of this PO may be assigned or subcontracted by Seller without the prior written approval of Buyer. Any amounts due Buyer from Seller, under this PO or otherwise, may, at Buyer's sole discretion, be applied as setoff or recoupment of any amounts due Seller from Buyer, whether under this PO or otherwise. Buyer's failure to insist on any right hereunder will not waive any other right, including, without limitation, the right to insist on strict performance in accordance with the terms hereof.

19. Buyer reserves the exclusive right to terminate all or part of this PO or to make changes hereto for Buyer's convenience, at any time, and Seller agrees to accept such termination or changes. In such event, (a) Seller will immediately cease all terminated work, shipments, and deliveries; (b) Seller will comply with any instructions from Buyer as to changes and/or terminated work in progress; and (c) Seller's sole and exclusive remedy will be an equitable adjustment hereto for work already performed, to the exclusion of, without limitation, recovery for lost profits, lost business opportunities, increased or unabsorbed overhead (direct or indirect), and other damages whether consequential or otherwise.

20. Buyer may terminate all or part of this contract for cause in the event of a default by Seller. In such event, Buyer will not be liable to Seller for any amounts, and Seller will be liable for and will hold Buyer harmless from any damages or losses (including attorneys' fees) resulting from Seller's breach or default. Any improper termination or declaration of default hereunder will be deemed to be for Buyer's convenience.

21. FHWA 1273 is hereby made part of this agreement

22. Department of Transportation79 FR 17655 is hereby made part of this agreement

23. GLF Construction Corporation cannot be held accountable for any late fees incurred due to delay of signed PO by the seller. PO must be signed in order to process payment.

24. Heartland Concrete will mobilize two High Performance Columatric Mixers with a Certified Operator and support personnel to deliver approx. 237.5 CY of Latex Modified Concrete-Very Early in one project Mobilization and Eight Weekly Mobilizations consisting of 40 Sunday thru Thursday night time pours to overlay the decks on Bridges #24, #71, #156, #164, #210, & #215 located on I-40 in Buncombe County. Heartland Concrete will need to mobilize to project no later than Monday April 30, 2018 for NCDOT calibrating setup.

25. GLF Construction Corporation will provide a Laydown Yard in close proximity (less than 15 minutes travel time from pour site) to the pour site with full access for full production. The yard will include a wash-out pit that is large enough to accommodate a sand and stone bin and parking for 2 mobile mixers and 2 tractor trailer tanker rigs.
26. GLF Construction Corporation will provide water for the mix and clean up along with a loader capable of dumping over the 11' high sides of the aggregate bins on our mobile mixers.
27. Heartland shall not be liable for any damages for delays caused by events beyond its control, nor shall be liable for any special, indirect, liquidated, or consequential damages, however caused.
28. GLF Construction Corporation agrees to indemnify Heartland and hold it harmless from any and all claims, damages, expenses, or losses, including attorney's fees, arising out of or resulting from the execution of the work specified herein and which are caused, in whole or part, by the negligent act or omission of the Customer, its employees, agents, and anyone for whose acts the Customer may be liable.
29. In the event GLF Construction Corporation fails to comply with any of the terms and conditions set forth herein, then Heartland may, in its sole discretion, stop shipment on this project, without penalty. In such an event, GLF Construction Corporation agrees to pay all costs of demobilization and remobilization.
30. Due to the FMCSA HOS regulations GLF Construction Corporation must provide Heartland sufficient notice of any schedule changes.
31. GLF Construction will be responsible for all sales and use taxes.
32. GLF Construction Corporation agrees to pay a fee of $1,875.00 for any pour that it cancels while Heartland is mobilized.
33. GLF Construction Corporation agrees to pay a fee of $1,050.00 per pour if the total number of pours exceeds forty(40).

000FR029_04

EXHIBIT B

**Ryan L. Beaver**
Partner
Rbeaver@bradley.com
704/338.6038 direct
704/332.8858 fax



June 1, 2021

Via U.S. Mail and E-mail (apeoples@hallboothsmith.com)
Hall Booth Smith, P.C.
Attn: Adam Peoples
72 Patton Avenue
Asheville, North Carolina 28801

      RE: NCDOT I-40 Project from MP-37 to MP-44
          Latent Defects in Latex Modified Concrete Overlay on Bridges

Dear Adam:

    I am following up on correspondence sent to Heartland Concrete LLC ("Heartland") on February 8, 2021 regarding the latent defects in the latex modified concrete overlays Heartland provided to GLF Construction Corporation ("GLF") in conjunction with the above-referenced Project. Bradley Arant Boult Cummings LLP represents GLF in its dispute with Heartland regarding the defective products and the necessary repairs to the bridges on the Project resulting from those defects. It is our understanding that you represent Heartland in connection with this dispute. If this is not the case, please let us know as soon as possible.

    Attached please find correspondence from NCDOT establishing the repair protocol for the latex modified concrete overlays on Bridges, #24, #71, #156, #164, #210, and #215 on the Project. As GLF has previously notified Heartland, GLF believes that these issues are Heartland's responsibility. Before commencing the work listed in this correspondence, GLF would like to offer Heartland a final opportunity to participate in these repair efforts on the Project. However, if Heartland maintains its position that it will not participate in the repairs, GLF will address the repairs and pursue Heartland for, among other things, the costs associated with these repairs, legal costs, and attorneys' fees. Currently, GLF estimates that the repairs to the bridges will cost approximately $90,000, though this amount is subject to change as GLF performs the work and determines the actual costs necessary to complete the work in a manner satisfactory to the NCDOT.

    Please advise by Friday, June 4, 2021 as to whether or not Heartland will participate in these repair efforts. Please let me know if you have any questions regarding the above.

        Sincerely,

        Ryan L. Beaver

Enclosure

4828-8962-3788.1

Bradley Arant Boult Cummings LLP | 214 North Tryon Street | Suite 3700 | Charlotte, NC 28202-1078 | 704.338.6000 | bradley.com



STATE OF NORTH CAROLINA
# DEPARTMENT OF TRANSPORTATION

ROY COOPER
GOVERNOR

J. ERIC BOYETTE
SECRETARY

May 27, 2021

Contract: C204054
WBS: 46408.3.2
F.A.: NHPIM-0040(070)
T.I.P.: I-5888A
County: Buncombe
Description: Pavement and Bridge Rehabilitation

Subject:      Latent Defects in Latex Modified Concrete Overlays

Mr. Eric Ogren
Harrison Construction Company Division of APAC-ATLANTIC Inc.
P.O. Box 6357
Knoxville, TN 37914

Mr. Ogren,

On April 27, 2021, representatives from the Department and GLF reviewed the Latex Modified Concrete (LMC) overlays on the following bridges: Bridge #24, Bridge #71, Bridge # 156, Bridge #164, Bridge # 210, and Bridge # 215 to determine if the conditions have worsened. During this review it was determined that no additional holes from sand/grout pockets had appeared in the deck.  However, it was determined that there was a significant area of delamination between the LMC overlay and the original deck on the center span of the Lt Lane on Bridge # 24, as well as several areas of separation between the LMC overlay and the elastomeric concrete around the foam joint seals on several other bridges

Based on these findings, the Department has determined that the center span Lt Lane on Bridge # 24 will need the following:  1) repair the delaminated area, and 2) final determination that no additional sand/grout pockets exist below the surface.  This will be accomplished by scarifying this deck 1" to confirm that no additional hidden pockets exist; if no additional hidden grout/sand pockets exist, you will then repair the area of delamination and replace the LMC overlay on this span.

Should the repair work on the center span Lt Lane on Bridge # 24 indicate that there are no hidden grout/sand pockets, then Harrison or their subcontractor, GLF, will be allowed to repair the remaining grout/sand pocket holes throughout the project by use of an approved non-shrink grout product.  Harrison Construction or their subcontractor, GLF, will need to propose which grout product they plan to use and how they will chip out or core out the grout/sand pockets for repair. Also, as part of these repairs Harrison or their subcontractor, GLF, will need to repair any cracks found between the LMC overlays and the elastomeric concrete on the foam joint seals.

*Mailing Address:*
NC DEPARTMENT OF TRANSPORTATION
CONSTRUCTION UNIT
1543 MAIL SERVICE CENTER
RALEIGH, NORTH CAROLINA  27699-1543

*Telephone:* (919) 707-2400
*Customer Service:* 1-877-368-4968

*Website:* ncdot.gov

*Location:*
1 SOUTH WILMINGTON STREET
RALEIGH, NORTH CAROLINA  27601

Mr. Eric Ogren
May 27, 2021
Page 2

However, should the repair on Bridge #24 indicate that there are hidden grout/sand pockets then the Department will require the following LMC overlays on the remainder of bridge #24 and bridges # 71 and 156 be repaired in the same manner as that on the center span of the Lt Lane Bridge #24 .

Please coordinate all repair operations and repair method proposals with the Asheville Resident Engineer's Office. Failure to respond to the request by the Department and make the necessary repairs may result in Harrison Construction Company and/or their subcontractors associated with this work being removed from the Department's list of prequalified bidders.

Should you have any questions concerning this matter, please contact me at (919)707-2400.

Sincerely

*E. Boyd Tharrington, PE*

—36C9CCE8BB68447...

E.B. Tharrington, PE
State Construction Engineer

Cc:
Mr. Brian Skeens, PE
Mr. Aaron Powell, PE
Mr. Randy McKinney, PE
Mr. Joseph Lawrence
Mr. Aaron Creasman, PE -GLF Construction